UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERALD BYRD,

      Plaintiff,

v.

RANDALL HAAS, *et al*.,

      Defendants.

_____/

Case No.: 17-11427

Stephen J. Murphy, III
United States District Judge

Michael J. Hluchaniuk
United States Magistrate Judge

**REPORT AND RECOMMENDATION ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF No. 80)**

## I.   PROCEDURAL HISTORY

On May 2, 2017, plaintiff Gerald Byrd, an inmate currently in the custody of the Michigan Department of Corrections (MDOC), brought this action, *pro se*, under 42 U.S.C. § 1983.  (ECF No. 1).  He claims violations of the First and Fourteenth Amendments and the Religious Land Use and Institutionalized Persons Act (RLUIPA).  On September 27, 2017, defendants Haas, Leach, Russell, Steward, Taylor, Washington, and White filed a motion to dismiss, or in the alternative for summary judgment.  (ECF No. 27).  Defendants' McKee and Umeh later filed their own motions.  (ECF Nos. 49, 55).  The motions were granted in part, denied in part.  (ECF No. 63).

The remaining defendants—Haas, Leach, McKee, and Umeh—filed the motion for summary judgment at bar on January 29, 2020.  (ECF No. 80).

Plaintiff, through counsel, responded to the motion.  (ECF No. 87).  Defendants then filed a motion to strike plaintiff's expert, which the undersigned denied in a separate Order.

This matter was referred to the undersigned for all pretrial purposes.  (ECF No. 84).  The undersigned heard argument on the motion for summary judgment on May 28, 2020.  The matter is now ready for report and recommendation.

## II.  FACTUAL BACKGROUND

Plaintiff is a practitioner of the Ifa religion, referred to as Yoruba by MDOC.  More properly, "Yoruba" refers to a cultural group from Western Nigeria who predominantly practice Ifa.  (ECF No. 80-5, PageID.860, at p. 28:19-21 – Byrd Deposition).  For purposes of this report, the two terms are used interchangeably in reference to the religion.  In plaintiff's view, this religion is "earth based" and "emphasizes living in harmony with nature, reverence for the ancestors, reverence for the spiritual forces[,] . . . respect for elders[,] . . . and the central purpose . . . [is] cultivating good character."  (*Id.* at PageID.860, at p. 26:21-25 – p. 27:1-2).

MDOC has a Policy Directive governing "religious beliefs and practices of prisoners."  (ECF No. 80-2, PageID.758, MDOC PD 05.03.150 effective Sept. 15, 2015).  MDOC recognizes Yoruba as a religion.  (*Id.* at PageID.774).  However, Yoruba is a "recognized religious group[] not authorized to conduct group religious services/activities."  (*Id.*) (emphasis in original).  The policy allows

2

prisoners belonging to the Yoruba religion to possess religious personal property in addition to religious reading material.  Specifically, Yoruba practitioners are allowed to possess one set of 16 cowrie shells, one strand of white consecrated beads, and one picture of The Orisha not exceed 9" x 12" (but no frame).  (*Id.*).

According to plaintiff, to practice his religion properly he needs to be able to attend group services and to possess more religious property items than currently allowed in the policy.  The following is a brief overview of some of the basic tenets of the Ifa religion necessary to explain the additional items plaintiff requested.  Ifa practitioners believe there is one supreme being called Olodumare.  (ECF No. 80-5, PageID.860, at p. 28:8-10).  Beneath this being are a number of deities and forces of nature called Orisha.  (*Id.* at p. 50:12-16).  Divination is an important practice in the religion.  Practitioners use divination as a means of communication with their ancestors and Orisha.  (ECF No. 87-6, PageID.1618, at p. 132 – Expert Williams Deposition).  Practitioners also perform smudging during group services for cleansing.  (ECF No. 80-5, PageID.867, at p. 57:8-12).

The three pieces of property MDOC allows are insufficient by themselves for these tasks, according to plaintiff.  He sent a request to MDOC officials asking that group services be allowed for Ifa prisoner practitioners and that practitioners be allowed to possess additional religious items.  He requested the following items:

3

- Elegua Heads – usually made of coconut, clay, wood, or stone; they represent the "Divine Messenger Edu;" practitioners must place this head upon their alter
- Obi – kola nuts used for Obi divination, which is "one of the four types or levels of divination in the Yoruba Religion[;]" the kola nuts are cast to reveal answers to questions
- Opele – a divining chain made with metal links or beads; they are used for those who have been taught and initiated by a "Babalawo" or priest[1]
- Opon Ifa – diving tray used to cast obis or cowrie shells; they are wooden trays
- Eni – straw mat used to set up shrines for a person's Orisha or ancestors
- Ilekes – beads of different colors that mark the level of commitment
- Iyere Osun – divination powder; the powder is not harmful or narcotic
- Herbs – used for healing and spiritual baths; these include sage, basil, oregano and many others
- Candles – each Orisha has a candle that is lit to strengthen the invocation of that Orisha; they are used on alters or shrines during service.
- 

(ECF No. 80-3, PageID.776-78 – Byrd's Request); (ECF No. 80-5, PageID.873, at

p. 80-85). Plaintiff also requested that group services be allowed for fellowship

and setting up ancestral and Orisha altars. (ECF No. 80-3, PageID.778).

The parties dispute whether plaintiff's request for the items was properly

submitted. MDOC policy directive 05.03.150 provides a mechanism by which

prisoners may request permission to possess religious property that is not already

authorized.

> Such requests from prisoners must be submitted in writing to the Warden or designee and include a description of the religious item along with an explanation of its significance to the prisoner's

---

[1] Plaintiff is not an initiated priest, but seemingly requested this item for a future prisoner who is an initiated priest.

designated religion.  The Warden or designee shall forward the request and any supporting documents to the CFA Special Activities Coordinator through the appropriate chain of command.  The CFA Special Activities Coordinator shall present the material to the CAC [Chaplaincy Advisory Committee] for review as needed prior to submission to the Deputy Director.

The Deputy Director shall make the final decision as to whether the religious item will be approved based on whether it is necessary to the practice of the prisoner's religion and whether possession of the item would pose a threat to the custody and security of the facility.  The decision whether the item is necessary to the practice of the prisoner's designated religion shall be based on any recommendation received from the CAC.  The Warden or designee shall be advised of the final decision and shall notify the prisoner.

(ECF No. 80-2, PageID.763, ¶¶ JJ-KK).

There does not appear to be a mechanism by which a prisoner practitioner of a recognized religion can request group religious services.  Defendants cite Paragraphs K and L as the closest thing to the process for making such a request, but these paragraphs are about requesting recognition of a religion.  The chain of command for forwarding that request is the same as the above-quoted policy.  It says that the Deputy Director will make the decision as to whether the group will be recognized as a religion, and if so, whether religious services, activities, and personal property will be allowed.  (ECF No. 80-2, PageID.759).

Plaintiff sent his request letter dated September 2, 2015 to David Leach, the Special Activities Coordinator.  He addressed the letter to "Mr. Leach."  (ECF No.

80-3, PageID.776).  In December 2015, plaintiff was transferred from Saginaw

Correctional Facility to Macomb Correctional Facility (MRF).  There, plaintiff

received Leach's response, dated December 29, 2015.  Leach explained that

paragraph JJ of Policy Directive 05.03.150 requires that such requests be submitted

in writing to the Warden or designee.  The letter was returned to plaintiff "for

submission in accordance with PD 05.03.150."  (ECF No. 80-6, PageID.892).

Chaplain White said the same to plaintiff when they met near the end of 2015.

White added that plaintiff needed to change the heading to reflect that he now

resides at the Macomb facility.  (ECF No. 80-9, PageID.914, at p. 59-60).

Plaintiff testified that in addition to sending the September letter to Leach,

he also sent it to the Warden at the Saginaw facility, but never heard from the

Warden about it.  (ECF No. 87-4, PageID.1396, at p. 68, 70).

After getting the response from Leach, plaintiff handwrote at the bottom of

the request letter "CC," and listed four places: MRF (Macomb) Warden, MDOC

Deputy Director, MDOC Special Activities Coordinator, prisoner file.  (ECF No.

80-3, PageID.780).  He did not re-type or rewrite the request letter.  Thus, the letter

was still addressed to Leach, the activities coordinator with Leach's address at the

top.  (ECF No. 87-4, PageID.1398-99, at p. 70-71).   He also did not change his

own address written in letter to reflect his residence at the Macomb facility.

Sometime in January 2016, he sent this request letter to the Macomb Warden

(defendant Randall Haas) through the kite system, to the Deputy Director

(defendant McKee), and again to the Special Activities Coordinator via regular

mail.  (*Id.* at PageID.1394, at p. 66).  It is unclear what happened with this letter.

Plaintiff tried again in February.  This time he hand-wrote a short

introductory letter addressed exclusively to the Macomb facility's Warden (Haas).

He wrote: "Enclosed is a petition for the approval of Group Religious Service,

Personal Religious Property . . . for the <u>Yoruba</u> religion, which I'm an adherent

of."  (ECF No. 87-15, PageID.2162) (emphasis in original).  He explained that he

sent a copy of his petition to Leach, who told him he had to send it to his Warden.

Plaintiff enclosed the letter from Leach directing plaintiff to resubmit his letter and

his September 2015 letter to Leach containing his requests and the explanation for

his requests.

Haas received plaintiff's letter.  The letter is time-stamped twice by the

Deputy Warden's Office for February 18 and March 8, 2016.  (*Id.*).  There is also a

handwritten note added by Haas in which he forwards the note and request to the

Chaplain to discuss with plaintiff.  (ECF No. 87-15, PageID.2161).  This note to

Chaplain White was not a directive that White become Haas' designee with regard

to plaintiff's requests.  White testified that while he worked at Macomb as the

Chaplain, he was never appointed as the Warden's designee for religious item

requests, but he did "handle" such requests.  (ECF No. 80-9, PageID.909, at p. 38-

39).  Had White been given the express directive to act as the designee for a religious items request, he would have forwarded it to the Special Activities Coordinator per the policy and chain of command, but that did not happen on Byrd's request.  (*Id.* at PageID.919 at p. 80).  The note was simply that Haas wanted the chaplain to look into the matter.

A month later in March 2016, having heard nothing from a prison official about his requests, plaintiff sent the request letter again, with a new handwritten introductory note before the attachments, this time to Leach and Deputy Warden McKee.  (ECF No. 87-22; ECF No. 87-20).  Evidence suggests that Leach received this copy.  He emailed Chaplain White on May 13, 2016 about the letter: "[Mr. Byrd] says he has not received any reply from the Warden or you. . . It does not appear that the proposal has been sent through the chain of command; at least I have not received it yet." (ECF No. 87-14, PageID.2157).  Leach asked White to check with the Warden's office to see if they received plaintiff's requests.  "If not, would [you] call Byrd out when you have time and ask him about it? I can have the CAC review it but the proposal has to reach me through the chain of command first." (*Id.* at PageID.2156).  That day, May 13th, White spoke to plaintiff.  White told Leach that plaintiff said that he sent the letter to the Warden—specifically, the copy of the letter initially sent to Leach in September 2015. (*Id.*).  Leach

responded, "That should be fine." (*Id.*).  Nothing happened with plaintiff's request.

On July 24, 2016, plaintiff wrote to Haas seeking a status update on his request.  (ECF No. 87-16, PageID.2171).  Defendant Haas attached a page to the letter and wrote "Chaplain ? RH [Randall Haas] 7-29-16."  (ECF No. 87-16, PageID.2170).  In other words, Haas passed the request on to White, again, but apparently was not making White his designee for purposes of handling the items request.

To be clear, plaintiff never re-wrote the actual request for religious property and for group services.  He continued to attach a copy of the original request letter from September 2, 2015 in each of his letters to the various officials without readdressing that letter.  However, when he sent the copy after the first time, he included a separate introductory letter addressed to the specific recipient and listing his current prison address, Macomb Correctional Facility, explaining the circumstances and history surrounding the request.

Having gotten no response from prison personnel to his request for religious personal property items and group services, the status quo remained: plaintiff was not allowed any items not already listed in the policy directive for Yoruba/Ifa practitioners and practitioners were not allowed to practice together in a group.

For his part, Deputy Director McKee does not recall ever receiving a letter from plaintiff and there is no dispute that he did not get the request from the Chaplain's Advisory Council per the policy directive chain of command.  Had he received the request from plaintiff, he said he would have forwarded it to the Special Activities Coordinator.  (ECF No. 80-11, PageID.1085, at p. 47).  Had he gotten a recommendation from the CAC under the policy, he would have evaluated the information and made a decision on the requests.  (ECF No. 80-11).

In addition to the claims based on the request for items and group services, plaintiff also raised a claim against corrections officer Cyril Umeh alleging that Umeh intentionally threw away the four cowrie shells plaintiff had in his cell after he was sent to segregation in June 2017.  (ECF No. 87-4, PageID.1448).  The shells are used for religious purposes and are allowed under the prison's religion policy.  It is normal that a prisoner's cell be packed up upon their move to segregation.  (ECF No. 80-12, PageID.1141 – Umeh Deposition).  If a cell is being packed up due to a transfer, the officer completes a "transfer pack up slip" itemizing everything (including anything that looks like trash) the officer found in the cell that is within that prisoner's control.  (*Id.* at PageID.1142).  All those items are then placed in a bag or bin and put in storage.  If contraband is found in the cell, it cannot be thrown away until either an administrative hearing takes place or the prisoner gives permission to throw the item away.  (*Id.* at PageID.1176).

Umeh packed up plaintiff's cell in this instance on June 11, 2017. (*Id.* at

PageID.1154-55). Prison policy mandates that the officer packing up the cell be

the only person allowed in the cell from the time the prisoner is removed (whether

from the cell or some other part of the prison) until the pack-up is complete.

Umeh, as the officer who packed up plaintiff's cell, was the only person in the cell

from the time of plaintiff's transfer to segregation and his completion of the pack-

up. The bunkmate would not have been allowed to go to the cell or remain in the

cell. (*Id.* at PageID.1171).

Umeh does not recall much about the pack-up or the property, but he insists

that he did not throw away cowrie shells from plaintiff's cell. He testified that he

never throws away any property without permission. (*Id.* at PageID.1177-78).

Plaintiff insists that Umeh threw the shells away because they were in the

cell before plaintiff was taken to segregation, his cell mate did not recall seeing the

shells in the cell after the pack-up, and Umeh conducted the pack-up. (ECF No.

87-4, PageID.1448). His shells are not listed on the inventory pack-up sheet.

### III.    ANALYSIS AND RECOMMENDATIONS

#### A.    Summary judgment – Standard of Review

When a party files a motion for summary judgment, it must be granted "if

the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party

asserting that a fact cannot be or is genuinely disputed must support that assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'"  *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).

In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove his case at trial by a preponderance of the evidence, on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also

for the rights of those "opposing such claims and defenses to demonstrate in the

manner provided by the Rule, prior to trial, that the claims and defenses have no

factual basis." *Id*. at 327.

B.    Plaintiff's Request for Items and Group Services

The undersigned finds that, as a practical matter, plaintiff properly submitted

his request for additional religious property and group services to defendant

Warden Haas, or at least that there is a question of material fact as to whether the

request was proper.  The policy directive directs inmates to submit their request for

property items to the Warden or his designee.  The request shall list the items and

explain their significance to the religious practice.

Plaintiff's request lists each property item requested with an explanation for

its significance.  It is true that when plaintiff sent the request letter to Haas, he

attached the letter initially sent to Leach and addressed to Leach.  He did not re-

address the request itself.  However, plaintiff did more than merely send to Haas

the request addressed to Leach.  He wrote an introductory letter explaining that he

sent it to Leach first, who told him to send it to Haas.  Plaintiff then attached

Leach's note to plaintiff directing him to submit the request to the Warden and the

request letter with Leach's name at the top.  Although not addressed to Haas, the

request letter was sent to Haas with explanation, and Haas received and

acknowledged the request.  Thus, plaintiff complied with the policy and sent his
request to his Warden.

C.     Qualified Immunity – Defendants Haas and McKee

The Supreme Court has established a two-part test in order to determine
whether qualified immunity is applicable to a particular situation.  *Saucier v. Katz*,
533 U.S. 194, 201 (2001).  One part of the test involves a determination of whether
the facts of the case, viewed in the light most favorable to the plaintiff, "show the
officer's conduct violated a constitutional right."  *Id*.  If the first question was
resolved in the affirmative, then the court would decide "whether the right was
clearly established."  *Id.*  If both questions are resolved in the affirmative, then the
doctrine of qualified immunity would not apply, and the case could
proceed.   Conversely, if the answer to either question is no, then qualified
immunity obtains.   The court may consider the questions in whichever order the
court concludes makes the most sense.  *Pearson v. Callahan*, 555 U.S. 223, 227
(2009).  Generally, under the second prong of this analysis, "[a] right is clearly
established if '[t]he contours of the right [are] sufficiently clear that a reasonable
official would understand that what he is doing violates that right.'"  *Hearring v.
Sliwowski*, 712 F.3d 275, 279 (6th Cir. 2013) (quoting *Anderson v. Creighton*, 483
U.S. 635, 640 (1987)) (citing *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009)).
"While there need not be 'a case directly on point' for the law to be clearly

established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Barton v. Martin*, 2020 WL 595981, at *4 (6th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "When a defendant invokes qualified immunity in a motion for summary judgment, the plaintiff must offer sufficient evidence to create a genuine dispute of fact that the defendant violated a clearly established right." *Folks v. Petit*, 676 Fed. Appx. 567, 569 (6th Cir. 2017) (citing *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608–09 (6th Cir. 2015)).

In a prior opinion, this Court dismissed most of the claims against defendant Leach on qualified immunity, holding that plaintiff does not have a clearly established right to have his request for items and group services responded to or forwarded. (ECF No. 63). The only remaining claim against Leach is the RLUIPA claim for injunctive and declaratory relief. The circumstances surrounding Leach's involvement in the claimed violations are different than for Haas, the Warden. As discussed above, plaintiff properly submitted his request to Haas. Under the policy, Haas had an obligation to forward the request to Leach, who would then move the request along the proper chain of command. But Haas did not forward the request the Leach. Because of his improper handling of the request, the request essentially stopped at Haas. For this reason, the basis for qualified immunity for Leach does not apply directly to Haas. As a practical

matter, if prisons could ignore or improperly process requests for religious accommodation without the possibility of liability, there would not be much incentive for prison officials to address requests.

Whether qualified immunity protects Haas from damages liability on plaintiff's claims for damages will addressed with each alleged violation in turn

As for defendant Deputy Director McKee, he, like defendant Leach, did not have a duty under the prison policy to take any action on plaintiff's request because the request did not get to him through the chain of command.  Like Leach, plaintiff did not have a clearly established right to have McKee address plaintiff's request outside the chain of command and outside the policy directive.  (*See* ECF No. 63).  Qualified immunity should attach to McKee for the First and Fourteenth Amendment claims against him.

### 1.   First Amendment – Defendant Haas

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. Const. amend I.  The right to freely exercise one's religion falls within the fundamental concept of liberty under the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Accordingly, state legislatures and those acting on behalf of a state are "as incompetent as Congress" to interfere with the right. *Id.* To establish that this right has been violated, plaintiff must establish that:

(1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) defendant's behavior infringes upon this practice or belief. *See Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also, Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same).

The Supreme Court has observed that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *see also, Turner v. Safley*, 482 U.S. 78, 84 (1987) ("[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution"). Thus, while "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates nevertheless retain the First Amendment protection to freely exercise their religion. *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987). But "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." *Wolfish*, 441 U.S. at 545. Operating a prison is a difficult task requiring "expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85.

When reviewing an inmate's claim of constitutional violation, courts must balance this policy of judicial restraint with the need to protect inmates' constitutional rights. *See Turner*, 482 U.S. at 85. The standard by which this

balancing occurs was articulated by the *Turner* Court, which held that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This standard represents a "reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Flagner*, 241 F.3d at 481 (citation and quotation omitted).

The *Turner* Court identified four factors that are relevant in determining the reasonableness of a challenged prison action:

> (1) there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
> (2) whether there are alternative means of exercising the right that remain open to prison inmates;
> (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and
> (4) whether there are ready alternatives available that fully accommodate the prisoner's rights at a *de minimus* cost to valid penological interests.

*Turner*, 482 U.S. at 89-91.

Defendants bear the initial burden to articulate a valid, rational connection between the challenged action and the legitimate governmental interest that motivated it. This burden is "slight, and in certain instances, the connection may be a matter of common sense." *Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir. 2012). If the first factor is satisfied, the remaining three factors are considered and balanced

together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the actions at issue are reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484. The *Turner* standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90-91. Instead, the issue is simply whether the policy at issue is reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484.

At the time of Haas' improper handling of plaintiff's requests, it was clearly established that plaintiff had the right to the free exercise of his religion unless that exercise posed a security or custody threat. *Walker v. Mintzes,* 771 F.2d 920, 929 (6th Cir. 1985); *Flagner v. Wilkinson,* 241 F.3d 475, 481 (6th Cir.2001) (The law was clearly established that to be entitled to First Amendment protection, the prisoner need only show that the belief or practice asserted is "religious in the person's own scheme of things' and is 'sincerely held.'"); *Hall v. Martin*, 2012 WL 1579334, at *13 (W.D. Mich. Mar. 29, 2012), *report and recommendation adopted*, 2012 WL 1579321 (W.D. Mich. May 3, 2012) ("denial of a religious accommodation on the basis that it was not "necessary" to the exercise of a person's chosen faith violates the First Amendment.").

Haas has not met his burden of demonstrating that the (de facto) denial of plaintiff's requests, and thus the policy denying additional religious items and group services, is reasonably related to a legitimate penological interest.  Haas provided no discussion that allowing group services would pose a security or custody threat.  Haas did not demonstrate that each of the requested property items would pose a security threat.  The closest defendants come is defendants' counsel's statement that one can imagine allowing a prisoner to possess an Eledua Head made of coconut, clay, wood, or stone would be dangerous.  (ECF No. 80, PageID.738).  But there is no indication of the size of the head or any sworn statement to support counsel's assertion.  As such, Haas has not met his burden of demonstrating "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it."  *Turner*, 482 U.S. at 89-91.

Notably, the dangerousness of some of the items is unclear where other groups are allowed to possess the same items.  For example, sage is allowed to Native American prisoner practitioners and prayer rugs are allowed to Muslim practitioners.  Plaintiff, as an Ifa practitioner, is not allowed these items, and any safety or security justification for disallowing them is plainly unclear.  Summary judgment should not be granted on this claim.

2.     Fourteenth Amendment Equal Protection – Defendant Haas

Plaintiff's equal protection claim is about the two property items plaintiff is not allowed as an Ifa/Yoruba practitioner but practitioners of other religions are allowed to possess for similar purposes.  He points out that Muslim prisoner practitioners are allowed to possess a prayer rug of certain dimensions.  However, he is not allowed a straw or cloth mat of similar dimensions for religious use. Native Americans are allowed sage and other herbs for smudging and perhaps other purposes, but Yoruba practitioners are not allowed the same herbs for the same religious practices.  This, plaintiff argues, is denial of equal protection under the law.

The Equal Protection Clause of the Fourteenth Amendment states that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1; *see Michael v. Ghee*, 498 F.3d 372, 379 (6th Cir. 2007).  The Equal Protection Clause of the Fourteenth Amendment "protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Scarbrough v. Morgan Cnty. Bd. Of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). In order to prevail in his claim for violation of the Equal Protection Clause, plaintiff must show that he was similarly situated in all material respects to others whose treatment he desires, coupled with a discriminatory purpose on the part of the accused state actor(s). *Village of*

*Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-266

(1977); *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 Fed. Appx. 826, 836 (6th

Cir. 2009). An intent to discriminate under the Equal Protection clause is merely

the intent to treat differently. *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245

(10th Cir. 2008). Further, taking into account the totality of the relevant facts,

where the law "bears more heavily" on members of one protected class than on

another, an "invidious discriminatory purpose" may be inferred. *Washington v.

Davis*, 426 U.S. 229, 242 (1976).  But, to establish an equal protection violation, a

plaintiff must establish more than differential treatment alone—a discriminatory

intent or purpose is required. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,

429 U.S. 252, 264–65 (1977).

Plaintiff has presented no evidence that Haas' de facto denial of the two

property items allowed in other religions (prayer rug for Muslims and herbs for

Native Americans) was the result of *intentional* or *purposeful* discrimination by

Haas on the basis of plaintiff's religious affiliation.  There is no evidence

suggesting that Haas declined to forward the request to defendant Leach because it

was a request for items for Ifa and not some other religion.  To defeat summary

judgment, plaintiff cannot rely on mere speculation of a discriminatory purpose.

*Frazier v. USF Holland, Inc*., 250 Fed. Appx. 142, 148 (6th Cir. 2007) ("To

survive a summary judgment motion, a plaintiff must put forward more than

speculations or intuitions.") (citing *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) (holding that plaintiff failed to establish knowledge on the part of the decisionmaker where plaintiff did not produce any evidence, direct or circumstantial, to rebut evidence that decisionmaker had no knowledge and plaintiff offered "only conspiratorial theories, not the specific facts required under the Federal Rule of Civil Procedure 56"). Haas's should be granted summary judgment on the merits of this claim.

### 3.   Fourteenth Amendment Due Process – Defendant Haas

A plaintiff alleging a procedural due process claim must demonstrate "1) a liberty or property interest protected by the due process clause; 2) a deprivation of that protected interest within the meaning of the due process clause; and 3) defendants' failure to afford adequate procedural rights prior to the deprivation." *Russell v. Wilkinson*, 79 Fed. Appx. 175, 178 (6th Cir. 2003). To demonstrate a protected liberty interest, "an inmate must show that the actions of prison officials either had the effect of altering the length or term of imprisonment or amounted to 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 2301 (1995)).

Plaintiff has not shown that denying his request for additional items and group services had the effect of altering the length or term of imprisonment.  He

argues, though, that the denial amounts to an atypical and significant hardship in relation to the ordinary incidents of prison life. What constitutes an atypical and significant hardship is not clearly defined, at least not in the context of a free exercise claim like plaintiff's. Plaintiff is asserting a liberty interest in the free exercise of his religion by having his request evaluated and decided. Haas's actions effectively took that process away from plaintiff.

In other contexts, it is clear that placing a prisoner in segregation or transferring him to another prison with stricter rules is not an atypical or significant hardship in relation to the ordinary incidents of prison life. *See Sandin v. Conner*, 515 U.S. 472, 486 (1995) (holding that the prisoner's placement in segregated confinement for thirty days was not a major disruption in the prisoner's environment and not "the type of atypical, significant deprivation in which a State might conceivably create a liberty interest"); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) (stating that, the Constitution does not "guarantee that the convicted prisoner will be placed in any particular prison," even if the degree of confinement in one prison is quite different from that in another prison, and that a conviction sufficiently extinguishes a prisoner's "liberty interest to empower the State to confine him in any of its prisons"); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (concluding that prisoners have no constitutional entitlement to a particular classification or eligibility for rehabilitative programs sufficient to invoke due

process); *see also Guile v. Ball*, 521 F. App'x 542, 544 (6th Cir. 2013) (stating that

"[a]lthough the indefinite confinement of a prisoner to administrative segregation

or the transfer to a type of maximum security facility with virtually no sensory or

environmental stimuli can create a liberty interest due to its 'atypical, significant

deprivation,' a simple transfer, issuance of a major misconduct ticket, and a higher

security classification does not trigger a liberty interest") (internal citations

omitted).  This case law is not applicable to plaintiff's case.

In cases where religious meals were discontinued, this is not found to be an

atypical hardship if the prisoner was seen eating non-conforming food, for example

eating non-kosher food when they had been approved for a kosher meal plan.

*Russell*, 79 Fed. Appx. 175, 178.  And, where a prisoner is prevented from

exercising his religion for a short period of time, but allowed to practice in his cell,

this is not an atypical or significant hardship in relation to the ordinary incidents of

prison life.  *See Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("Phillips was

not prevented from exercising his religion within his cell, thus he was not

subjected to an atypical and significant hardship. Additionally, he was only denied

religious services for thirty-seven days. This is not an atypical and significant

hardship that Phillips could not have anticipated upon his incarceration.").

Imposing a restriction on religious practice for a short period of time while the

prisoner worships in his cell might not be an atypical hardship, but preventing the

26

prisoner completely from practicing his religion while confined and without security/custody justification for total restriction clearly would impose such a significant hardship.  Indeed, case law recognizes that prisoners do not lose their First Amendment rights because of incarceration, though their religious practice may be curtailed some in the interest of safety and custody.  This principle is clearly established.  As Haas' improper processing of the request effectively imposed an atypical and significant hardship on plaintiff, and his improper handling of the request took away what process plaintiff had to under prison policy.  Haas should not be granted summary judgment on this claim.

With respect to any property interest in the items requested, the procedural protections of the Fourteenth Amendment are not implicated where an individual possesses simply "an abstract need or desire" or a "unilateral expectation" of receiving a particular item or benefit. *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 756, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) (quoting *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)); *see also, Bauss v. Plymouth Township,* 2007 WL 1451977 at *6 (6th Cir. May 17, 2007). Rather, the individual must "have a legitimate claim of entitlement" to the item or benefit at issue. *Gonzales,* 545 U.S. at 756; *Bauss,* 2007 WL 1451977 at *6. Moreover, an individual cannot possess a constitutionally protected property interest in an item or benefit where "government officials may grant or deny it in

their discretion." *Gonzales,* 545 U.S. at 756; *Bauss,* 2007 WL 1451977 at *7. As prison officials could grant or deny plaintiff's requests for property in their discretion, it appears he does not have a property interest in the items he requested. Thus, to the extent plaintiff intended to raise such a claim against Haas, Haas is entitled to summary judgment.

### D. RLUIPA – Defendants Haas, Leach, and McKee

Defendants Haas and Leach argue first that the request for injunctive relief under RLUIPA is moot because both have since retired from MDOC. Defendants cite no authority for their mootness argument. Rule 25(d) provides as follows:

> (d) Public Officers; Death or Separation from Office. An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution.

Fed. R. Civ. P. 25(d); *see Horacek v. Heyns*, 2016 WL 11263235, at *3 (W.D. Mich. Dec. 15, 2016) ("[W]hen defendants sued in their official capacities leave their positions, their successors automatically assume their roles in the litigation."). Thus, the RLUIPA claim against these defendants in their official capacities is not

moot due to their retirement. *See Kaminski v. Coulter*, 865 F.3d 339, 343 (6th Cir. 2017).

Plaintiff's transfer to another facility also does not moot his claim for injunctive relief. Transfer moots a claim where the controversy no longer exists— for example, where the new prison would allow the requested religious accommodation. *See Colvin v. Caruso,* 605 F.3d 282, 289 (6th Cir. 2010) (inmate's RLUIPA claims for injunctive and declaratory relief based on a challenge to a particular facility's policies and procedures rendered moot by his transfer to another facility); *Cardinal v. Metrish*, 564 F.3d 794 (6th Cir. 2009) (The Court of Appeals expressly held that the plaintiff's transfer to a diet-accommodating facility mooted the plaintiff's claims for both injunctive and declaratory relief seeking the accommodation). *Cook v. Cashler,* 2013 WL 1962388 at *3 (W.D. Mich., May 10, 2013) ("the Sixth Circuit has repeatedly held that claims against prison officials for both injunctive relief and declaratory relief are moot if the inmate is no longer at the facility where the alleged wrongdoing occurred"). Here, the transfer did not result in plaintiff obtaining group services or more religious personal property. And, plaintiff's claims are against MDOC prison policy, not the policy of a particular prison. Thus, the claim is not moot.

Now to the merits of the RLUIPA claim against defendants Haas, Leach, and McKee. Questions of fact remain as to whether these defendants substantially

burdened plaintiff's religious practice.  RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). Under RLUIPA, defendants cannot "impose a substantial burden on the religious exercise of [its inmates] ... unless [MDOC] demonstrates that [it] ... (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.§ 2000cc-1. A burden shifting framework applies to RLUIPA claims.

The plaintiff has the initial burden to make two showings: (1) he or she has a "sincerely held religious belief" and (2) the government's action or policy "substantially burden[s] that exercise" by, for example, forcing the plaintiff "to 'engage in conduct that seriously violates [his or her] religious beliefs.' " *Holt v. Hobbs*, 574 U.S. 352, 360 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014)). If the plaintiff satisfies this burden, the government must then show that its action or policy (1) is "in furtherance of a compelling governmental interest" and (2) "is the least restrictive means of furthering that ... interest." 42 U.S.C. § 2000cc-1.  When evaluating plaintiffs' claim, this Court must keep in mind RLUIPA's "expansive protection for religious liberty." *See Holt*, 135 S. Ct. at 860; *see also* 42 U.S.C. § 2000cc-3(g) ("This chapter shall be construed in

favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.").

Defendants do not challenge that plaintiff's beliefs are sincerely held.

Defendants argue that they did not impose a substantial burden on plaintiff's religious practice because plaintiff continued to practice his religion in his cell. (ECF No. 80, PageID.743).  The statute does not define the term "substantial burden." Nonetheless, to come within the scope of RLUIPA the burden in question must render religious exercise "effectively impracticable." *Perreault v. Michigan Dep't of Corrs.*, 2018 WL 3640356, at *4; *see also, Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise). A "substantial burden" requires something more than an incidental effect on religious exercise." *Morgan v. Trierweiler*, 2019 WL 2098179, at *4 (W.D. Mich. May 14, 2019). A burden is less than "substantial" where it imposes merely an "inconvenience on religious exercise." *Kitchen v. Leach*, 2019 WL 2647892, at *3 (quoting *Konikov v. Orange County, Fla.*, 410 F.3d 1317, 1323 (11th Cir. 2005)); *see also Clinton v. Duby*, 2018 WL 5276252, at *3 ("RLUIPA was not intended to create a cause of action in response to every decision which serves to inhibit or constrain religious exercise, as such would render meaningless the word 'substantial.'").  Plaintiff bears the burden to establish that his ability to exercise

his religion has been substantially burdened. *See Kaufman v. Schneiter*, 474 F. Supp.2d 1014, 1025 (W.D. Wis. 2007).

In support of his assertion that his religious practice is substantially burdened, plaintiff provided his sworn testimony and expert testimony on the necessity of the items he requested.  As stated in his brief,

> Ifa practitioners believe in the necessity of communing with their ancestors and the Orisha. They make this communion through a process called divination. Individual practitioners must divine in order to practice the Ifa religion. In order to conduct divination, Ifa practitioners must cast cowrie shells affixed to coconut shells or kola nuts onto a divination tray called an "Opon Ifa." (Ex. E, at 139-40 [Expert Deposition]). Divination must be conducted with a mat or cloth protecting the divination from the ground. (Id. at 142-43). The practitioners read the combination of results from the cast to divine answers from the Orisha. (Id.) Similarly, practitioners use herbal baths (using a variety of herbs) in order to properly invoke particular Orisha. (Id. at 143-44). Ifa practitioners also believe that a small wooden or stone "Elegba head" is a representation of the divine messenger, Esu, who is necessary to facilitate communication with the Orisha. (Ex. C, at 80 [Plaintiff's Deposition]). Ifa practitioners also require a set of necklace and bracelet beads called Ileke and Ide beads, which offer spiritual protection and facilitate communication with the Orisha during divination. (Ex. E, at 144-52; Ex. K [Plaintiff's Request for Items]; Ex. C, at 79-82, 88-94).

(ECF No. 87, PageID.1262-63).

Defendants are correct that plaintiff used makeshift items in his cell to represent those things the policy did not allow him to possess. However, according to plaintiff, those makeshift items are considered contraband and subject to destruction at any time. (ECF No. 87-4, PageID.1436-44). He also risks a misconduct ticket by possessing those items. (*Id.* at PageID.1473). Defendants do not refute this. (*See* ECF No. 80, PageID.743).

If plaintiff is subjecting himself to a misconduct ticket while using makeshift items that he and his expert say are necessary to the religion, then there is at least a question of material fact whether denying these items imposes a substantial burden on his practice. As plaintiff points out, the Sixth Circuit has stated that facing a serious consequence by practicing a religion is a substantial burden. *New Doe Child # 1 v. Congress of United States*, 891 F.3d 578, 589 (6th Cir. 2018). In *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014), the consequence for the corporate plaintiffs was paying "an enormous sum of money"—millions of dollars. *Id.* at 2779. In *Holt v. Hobbs*, 135 S.Ct. 853 (2015), the consequence for the inmate plaintiff was "serious disciplinary action." *Id.* at 862. In *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), the Government conceded that it imposed a substantial burden: The plaintiff's sacramental substance could trigger a criminal prosecution. *Id.* at 425.

The burden then shifts to the defendants to show a compelling governmental interest in the prohibition of additional religious property and group services, and that least restrictive means were used to achieve that interest.  Defendants, however, made no effort to demonstrate that denial of the items and group services is the least restrictive means of furthering the prison's interest in safety and security.  (*See* ECF No. 80, PageID.743-44, 748).  Instead, they blame plaintiff's religious predicament on his alleged failure to properly request items and group services in the first place.  Because defendants have not carried their burden on the RLUIPA claim, they should not be awarded summary judgment.

      E.    <u>Defendant Umeh</u>

        1.    RLUIPA

There is a question of fact relevant to plaintiff's RLUIPA claim against Umeh, but it is not material.  The parties dispute whether Umeh threw out the four cowrie shells in plaintiff's cell.  If he did not, then Umeh cannot have violated plaintiff's religious rights.  If he did, the question then is whether throwing away the shells amounted to a substantial burden imposed on plaintiff's practice and that discarding the shells was the least restrictive means of achieving a compelling governmental interest.

Here, however, plaintiff cannot establish a substantial burden to his religious practice from the loss of cowrie shells.  Again, to come within the scope of

RLUIPA the burden in question must render religious exercise "effectively impracticable." *Perreault v. Michigan Dep't of Corrs.*, 2018 WL 3640356, at *4; *see also, Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise). The prison's policy allowed him, as an Ifa practitioner, to possess 16 cowrie shells, although he only had four shells. He could purchase these shells presumably at any time, or least when he was without any shells.  Thus, if Umeh threw them out, plaintiff could purchase or obtain in some other way another set of shells.  Having to order or purchase another set of shells was surely inconvenient to plaintiff, but his religious exercise was not rendered "effectively impracticable."  It was the lack of all the items not allowed by the prison policy that made religious exercise effectively impracticable. Accordingly, Umeh's alleged action could not amount to a substantial burden on plaintiff's religious practice.  *Funzie v. Little*, 2010 WL 1010021, at *5 (M.D. Tenn. Jan. 12, 2010), *report and recommendation adopted*, 2010 WL 1010090 (M.D. Tenn. Mar. 18, 2010) ("Plaintiff has failed to show that the seizure [of his religious books] placed a substantial burden on his religious exercise. While the unavailability of his books might have made certain religious practices inconvenient, that in itself does not rise to the level of "substantial burden.").  The RLUIPA claim should be dismissed against Umeh.

35

2.    Fourteenth Amendment Procedural Due Process

Plaintiff alleges that Umeh violated procedural due process when he allegedly threw away plaintiff's cowrie shells during a pack-up of plaintiff's cell. This claim fails as a matter of law.  The doctrine announced in *Parratt v. Taylor,* 451 U.S. 527, 543-44 (1981), *overruled in part by Daniels v. Williams,* 474 U.S. 327 (1986), will defeat a procedural due process claim if the following three conditions are met: 1) the deprivation was unpredictable or random; 2) predeprivation process was impracticable; and 3) the state actor was not authorized to take the action that deprived the plaintiff of his property. *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995) (per curiam). Given that plaintiff alleges that Umeh improperly threw away his cowrie shells, he has alleged a random and unauthorized deprivation of his property.  *Id.* at 479-80. "'In a § 1983 case claiming the deprivation of a property [or liberty] interest without procedural due process of law, the plaintiff must plead and prove that state remedies for redressing the wrong are inadequate.'"  *Id.* at 479 (quoting *Vicory v. Walton,* 721 F.2d 1062, 1066 (6th Cir.1983).  Here, plaintiff has not pled or shown that Michigan's judicial remedies are inadequate, or that it would be futile to make the argument in the courts of Michigan that a prison official improperly threw away his cowrie shells. Summary judgment should be granted to Umeh on this claim.

3.      Qualified Immunity and the First Amendment claim

Umeh argues that he is entitled to qualified immunity because, even if Umeh impermissibly threw away the cowrie shells, there is no clearly established right to possess cowrie shells. (ECF No. 80, PageID.749).  Umeh defines the question too narrowly.  As addressed above in the discussion on defendant Haas' First Amendment liability, it was clearly established in June 2017 that plaintiff had the right to the free exercise of his religion unless that exercise posed a security risk in the prison.  If such a risk existed, the regulation or action curtailing or prohibiting free exercise must be reasonably related to legitimate penological interest. *Turner*, 482 U.S. at 89.

If Umeh threw away the shells, there appears to be no rational penological interest necessitating the action.  Prison policy already allowed plaintiff to possess cowrie shells for the purpose of practicing his religion.  Umeh does not assert any interest in disposing of the shells.  Again, of course, if the finder of fact concludes that Umeh did not throw away the shells, then there is no violation of plaintiff's religious rights.  Summary judgment should not be granted on this claim.

F.      Conclusion

The undersigned makes the following recommendation on the disposition on defendants' motion for summary judgment:

- That summary judgment be denied to defendant Haas on plaintiff's First Amendment free exercise and Fourteenth Amendment due process claims, but that summary judgment be granted to him on plaintiff's Fourteenth Amendment equal protection claim;

- That plaintiff's RLUIPA claim against Haas, Leach, and McKee move forward, but that summary judgment be granted to defendant Umeh on the RLUIPA claim;

- And that Umeh be denied summary judgment on plaintiff's First Amendment claim, but be granted summary judgment on plaintiff's Fourteenth Amendment due process claim.

## IV.    RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendants' motion for summary judgment (ECF No. 80) be **GRANTED IN PART, DENIED IN PART**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: May 29, 2020

s/Michael J. Hluchaniuk
Michael J. Hluchaniuk
United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

I certify that on May 29, 2020, I electronically field the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

s/Durene Worth
Case Manager
(810) 341-7881
durene_worth@mied.uscourts.gov